765 P.2d 767

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**MICHAEL R., A Child, Defendant–Appellant.**

**No. 10807.**

Court of Appeals of New Mexico.

Oct. 6, 1988.

Certiorari Denied Nov. 9, 1988.

Hal Stratton, Atty. Gen., Santa Fe, for plaintiff-appellee.

Jacquelyn Robins, Chief Public Defender, Lynne Fagan, Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

ALARID, Judge.

This is a Children's Court case in which the child appeals from the children's court's judgment and disposition finding him to be a delinquent child and placing him on probation. The calendar notice proposed summary affirmance. The child filed a timely memorandum in opposition to proposed summary affirmance. Having found his memorandum unpersuasive, we affirm.

The sole issue raised is whether the children's court could place the child on probation without first entering a finding that he is in need of care and rehabilitation. The child contends that a finding that the child is in need of care and rehabilitation is necessary in order to place a child on probation. In his docketing statement, he cited several cases decided by this court, which have held that such a finding was required in adjudicating proceedings on a petition alleging delinquency. These cases were decided under prior law and, thus, are distinguishable from the present case. In holding that the adjudicatory proceedings on a petition alleging delinquency involve two aspects, (1) whether the child committed the delinquent act and (2) whether the child is in need of care and rehabilitation, this court relied, in part, on the statute in effect at the time the cases were decided. The statute defined a delinquent child as a child who has committed a delinquent act and who is in need of care and rehabilitation. *State v. Doe,* 95 N.M. 90, 619 P.2d 194 (Ct.App.1980); *State v. Doe,* 93 N.M. 206, 598 P.2d 1166 (Ct.App.1979); *State v. Doe,* 90 N.M. 249, 561 P.2d 948 (Ct.App. 1977).

The applicable statute in the present case, NMSA 1978, Section 32-1-3(P) (Cum. Supp.1988) (applicable until July 1, 1989), defines a delinquent child as "a child who has committed a delinquent act." The children's court found that the child committed the delinquent act alleged in the petition. The child does not challenge this finding.

NMSA 1978, Section 32-1-31(E) (Repl. 1986), provides that "[i]f the court finds that a child alleged to be delinquent or in need of supervision is not in need of care or rehabilitation, it may dismiss the petition and order the child released from any detention or legal custody imposed in the proceedings." It does not require that the children's court dismiss the petition, as did the statute in effect at the time the above cases were decided. Rather, it leaves the children's court with discretion in determining whether or not to dismiss the petition.

Section 32–1–31(E) further provides that "[n]o child shall be placed in the custody of the department of corrections after adjudication of his case without a finding of need for care and rehabilitation." There is no such requirement for placing a child on probation.

Given these changes in the relevant statutes, we conclude that the legislature has changed the law on which our prior cases were based. As a result, the children's court can now place a delinquent child on probation without finding that the child is in need of care and rehabilitation.

■ In his memorandum in opposition, the child concedes that the statute does not specifically require that a finding of the need for care and rehabilitation be made for placing the child on probation. Where the meaning of the statutory language is plain, and where the words used by the legislature are free from ambiguity, there is no basis for interpreting the statute. *State v. Mobbley*, 98 N.M. 557, 650 P.2d 841 (Ct.App.1982). He emphasizes that the legislative purpose of the Children's Code is to provide for the care of children and to provide a program of supervision, care and rehabilitation. He also contends that the provisions of the Children's Code should be interpreted to provide care, supervision and rehabilitation, as needed, to children coming before the court. The child reasons that the purposes of the Code are not fulfilled by depriving a child of any liberty unless the children's court finds a need for care and rehabilitation. We disagree.

■ The interpretation set out above is consistent with the purposes of the Children's Code outlined by the child in his memorandum. The children's court exercises its discretion in determining whether a child needs supervision, care and rehabili-

tation, and what sort of supervision is appropriate for the particular child before the court. Placing a child on probation is an alternative that now lies within the children's court's discretion for a child who has been adjudicated a delinquent.

■ We need not inquire into the wisdom, policy or justness of an act of the legislature. *See Gruschus v. Bureau of Revenue*, 74 N.M. 775, 399 P.2d 105 (1965). In interpreting a statute, our goal is to decide what the words chosen by the legislature mean. *Security Escrow Corp. v. State Taxation & Revenue Dep't*, 107 N.M. 540, 760 P.2d 1306 (Ct.App.1988). In this case, the legislature used the phrase "may dismiss" where it had formerly provided that the children's court "shall dismiss." *See* 1984 N.M.Laws, ch. 74, § 1. The legislature clearly gave the children's court discretion regarding whether to dismiss a case or place a child on probation when it has found that the child is not in need of care and rehabilitation. *See* § 32–1–31(E). Therefore, the children's court acted within the discretion given to it by the legislature.

Based on the above, the children's court had authority to place the child on probation without first entering a finding that he was in need of care and rehabilitation. Accordingly, the judgment and disposition of the children's court is affirmed.

IT IS SO ORDERED.

MINZNER and FRUMAN, JJ., concur.

765 P.2d 1165

Kevin D. O'BRIEN and Denny (Dennis) McCoy, d/b/a T.C. Cattle Co., Plaintiffs–Appellants,

v.

William O. CHANDLER, R.E. "Rex" Reeves, First National Bank of Clayton, a New Mexico national bank, New Mexico Cattle, Inc., Craig Reeves and Gene Atchley, Defendants–Appellees.

No. 17257.

Supreme Court of New Mexico.

Dec. 5, 1988.

Richard A. Koehler, Geneva, Neb., Robert S. Skinner, Raton, for plaintiffs-appellants.

Robert O. Beck, Judith D. Cooper, Beck & Cooper, Clayton, for defendants-appellees.

## OPINION

RANSOM, Justice.

This action arose out of an oral agreement between Dennis McCoy, an Oklahoma cattle dealer doing business as T.C. Cattle Co.,[1] and William Chandler, a cattle broker from Texas. McCoy agreed to ship cattle to New Mexico Cattle, Inc. (feedlot) in Union County, New Mexico, for delivery to Chandler. The cattle consisted of four lots of steers and two lots of heifers with a combined total value of $119,122.30. They were delivered to the feedlot in March 1986, after which time McCoy provided invoices to Chandler, which described the cattle and set out the sales price. Subsequently, McCoy demanded payment. Chandler refused.

Without McCoy's knowledge, Chandler obtained a loan from First National Bank in Clayton (bank) and pledged as collateral the subject cattle. A financing statement and a security agreement covering the cattle were filed of record. The bank claims that it had no knowledge of any interest McCoy may have had in the cattle when it made the loan to Chandler.

McCoy sued to recover the cattle, claiming he was to retain title until payment was made by Chandler. Initially, the interested parties agreed that the cattle should be fed by the feedlot and sold at an appropriate time with the proceeds paid into the court. McCoy subsequently filed a motion for partial summary judgment seeking release of the cattle from the feedlot. The bank filed a counter motion for partial summary judgment, arguing that it had perfected a security interest in the livestock superior to any claim of McCoy. The court entered judgment for the bank, relying upon the facts specifically pled in McCoy's complaint

and certain provisions of the Uniform Commercial Code (U.C.C.), NMSA 1978, Sections 55-1-101 to 55-9-507. We affirm.

The court ruled that the bank's perfected security interest in the subject cattle was superior to any interest or right of McCoy. The court determined Chandler's liability included the principal amount of the loan totaling $84,461.95 plus $9,814.94 in accrued interest and a per diem interest payment thereafter of $31.24. Further, the court enforced the agister's lien of the feedlot for the care, feeding, and maintenance of the cattle and ruled that the feedlot had a right to have this lien satisfied in the amount of $65,819.02 plus accrued interest of $7,212.32 and a per diem interest payment thereafter of $19.83. The court assigned the agister's lien a second priority behind the bank's claim. Based upon the above determinations as to the priority of lien interests, McCoy's claims against the feedlot, its owner and president, and the bank president were dismissed. Default judgment was entered against Chandler, who was duly notified of the hearing but failed to appear. The district court also determined that Chandler had committed a fraud against McCoy and, after a damages hearing, awarded McCoy actual damages in the amount of $139,459.49 for the value of the cattle plus interest and $90,000 in punitive damages. This award received third priority behind the other two claims.

*Summary judgment.* Once the bank made a prima facie showing of no genuine issue of material fact and that as a matter of law it was entitled to summary judgment, *see Goodman v. Brock,* 83 N.M. 789, 498 P.2d 676 (1972), the burden then shifted to McCoy to show at least reasonable doubt as to whether a genuine issue for trial existed. *Koenig v. Perez,* 104 N.M. 664, 726 P.2d 341 (1986). McCoy asserts that a genuine issue of material fact existed regarding the terms of the oral agreement as described in his deposition testimony.

---

**1.** By stipulation of all the parties, plaintiff Kevin D. O'Brien, co-owner of T.C. Cattle Co., was

dismissed with prejudice as a party to the lawsuit on January 9, 1987.

In granting summary judgment, the district court based its decision on shipping bills showing the six lots of cattle to be delivered to the feedlot for Chandler and ruled that McCoy's verified complaint presented "positive and definite facts * * * that cattle were shipped by McCoy and * * * delivered to Chandler * * *." The deposition testimony of McCoy described a scenario whereby no obligation was created on the part of Chandler to purchase any of the cattle after delivery. Indeed, McCoy contends that according to their agreement Chandler had the right to reject any or all of the cattle. McCoy believed that once the cattle arrived at the feedlot, Chandler would inspect and sort the cattle and then negotiate a purchase price with McCoy. McCoy admits that Chandler did go to the feedlot and inspect the subject cattle, but claims that Chandler failed to engage in the selection and sorting process, thereby falling short of compliance with the terms of the agreement. Therefore, argues McCoy, no interest in the cattle was created in Chandler.

■ McCoy believes the district court disregarded (or perhaps weighed) his deposition testimony on this point. *See In re Adoption of Jane Doe*, 87 N.M. 253, 531 P.2d 1226 (Ct.App.), *cert. denied sub nom. Doe v. Roe*, 87 N.M. 239, 531 P.2d 1212 (1975) (a party who chooses to plead specific facts is bound by what has been specifically pleaded). In affirming, we do not disregard the deposition testimony. Giving due consideration to McCoy's deposition testimony, we agree with the trial court that it is incredible and unreasonable to infer that six separate lots of cattle were shipped by McCoy from Oklahoma to New Mexico without his having concluded a contract of sale as alleged in his verified complaint. The specific agreement between buyer and seller is simply not a material issue. What is material is the fact that delivery was made by a seller to a buyer, and that fact is not in dispute.

*Intention to conclude a contract: Identification of the cattle to the contract; Price left to be agreed.* McCoy argues that, because the cattle had not

been identified to the contract, title to these cattle had not passed to Chandler under NMSA 1978, Section 55–2–401(1). He asserts that Chandler's interest was consequently too slight to permit attachment of the bank's security interest. We disagree. Section 55–2–401(1) states:

[T]itle to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501 [55–2–501 NMSA 1978]), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this act [chapter]. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article on secured transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties * * *.

■ The clause on which McCoy relies refers to Section 55–2–501. This section provides: "The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them." § 55–2–501(1). The subject cattle in this case both were in existence and were the goods to which the oral agreement referred. The allegations that McCoy shipped the cattle to Chandler in New Mexico subject to Chandler's right to return some or all of the cattle and subject to further negotiations on the price do not raise material issues of fact as to whether a contract existed. The fact that the transaction was a "sale or return" does not negate the existence of the contract. *See* § 55–2–326. The buyer and seller may enter into a binding sales contract notwithstanding that they have yet to agree on a price. *See* § 55–2–305.

*Effect of delivery.* Because McCoy delivered the cattle under the contract, title passed to Chandler even though McCoy may have retained certain security inter-

ests in the cattle, as discussed below. Section 55–2–401(2) provides:

[U]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading * * *

McCoy also claims that because the cattle were delivered to the feedlot and not to Chandler personally, it was necessary under Section 55–2–705 for the feedlot as bailee to notify Chandler that the goods were being held for him. Absent such notification, McCoy, as seller, could stop delivery of the goods. *See Ceres, Inc. v. ACLI Metal & Ore Co.*, 451 F.Supp. 921 (N.D.Ill.1978).

It should be noted that under *Ceres*, it is the seller who has the burden of showing that acknowledgement was not given to the buyer. *Id.* at 924. McCoy has failed to alert us to evidence that he attempted to stop delivery before Chandler was notified by the feedlot that the cattle were being held for him. McCoy admits that Chandler went out to view the cattle at the feedlot with the feedlot owner, Gene Atchley, before obtaining a loan from the bank and before McCoy alleged he attempted to reclaim the cattle. Thus, McCoy failed to exercise his rights under Section 55–2–705 in a timely fashion.

■ *The buyer's power to create a security interest in a third party under Article 2.* Because the goods were delivered to Chandler under the contract, he had the power to create a security interest in a third party. This interest attached even though Chandler was found to have committed a fraud against McCoy and thus only had voidable title to the cattle. Section 55–2–403(1) allows certain transferors to pass greater title than they themselves claim. *See In re Samuels & Co.*, 526 F.2d 1238, 1242 (5th Cir.) (party with perfected security interest in bankrupt buyer's after-

acquired inventory took priority over unpaid seller of cattle) *cert. denied sub nom. Stowers v. Mahon*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). "Section [2–403(1)] gives good faith purchasers of even fraudulent buyers-transferors greater rights than the defrauded seller can assert. This harsh rule is designed to promote the greatest range of freedom possible to commercial vendors and purchasers." *Id.* Section 2–403(1) provides:

A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though: * * * (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

Given our discussion above, it is clear that the cattle had been delivered under a "transaction of purchase" and hence that Chandler was a "purchaser." *See* § 55–1–201(33) (Cum.Supp.1988). The court in *In re Samuels & Co.* held that under the comparable section of the Texas U.C.C. it is transfer of *possession* to the defaulting buyer which gives him the power to transfer good title to a good faith purchaser for value. 526 F.2d at 1246–47. Once McCoy delivered the cattle pursuant to his agreement with Chandler, under Section 2–403(1) Chandler had the power to transfer good title to a good faith purchaser for value.

The term "purchaser" is defined broadly under the U.C.C. to include an Article 9 secured party. *Id.* at 1242. Under Section 55–1–201(19), the only matter material to good faith is honesty in the conduct of the transaction at hand. Chandler had possession of the shipping invoices and represented that he had already paid for the cattle when he negotiated for the loan. McCoy has identified no fact that places into dispute the good faith status of the bank with respect to the bank's conduct in this trans-

action with Chandler. Therefore, the bank acquired a valid security interest in its dealing with Chandler, which the bank perfected by filing.

Comment 2 to Section 55–2–403 notes that the policy underlying the section as a whole is the protection of good faith purchasers such as Article 9 secured parties against "hidden interest[s]." Whether McCoy shipped the cattle to Chandler under a title-retention contract as alleged in his complaint, or whether he shipped the cattle to the feedlot pursuant to the agreement described in his deposition testimony, his retained interest in the cattle was indeed "hidden" from the view of the bank as a "good faith purchaser" within the meaning of Section 55–2–403.

It is with such considerations in mind that the court in *In re Samuels & Co.* stated that "[t]he Code's overall plan * * * typically favors good faith purchasers," 526 F.2d at 1241, and, "[a]ny seeming unfairness * * * resulting from the Code's operation is illusory, for the sellers could have protected their interest * * * if they had merely complied with the U.C.C.'s purchase-money provisions." *Id.* at 1247–48. Clearly, McCoy could have protected his interests in this case.

*The seller's security interests under Articles 2 and 9.* The next question is therefore whether McCoy, by virtue of his status as seller, had a superior interest to that of the bank or Chandler's other creditors in the subject collateral. McCoy claims that he possessed such an interest by virtue of NMSA 1978, Section 55–9–113. That section provides:

A security interest arising solely under the article on sales (Article 2) is subject to the provisions of this article except that to the extent that and *so long as the debtor* does not have or *does not lawfully obtain possession of the goods:*

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default by the debtor are governed by the article on sales (Article 2).

(Emphasis added.)

McCoy argues that because Chandler lacked documents of title to the cattle an issue of fact existed about whether Chandler's possession was unlawful and whether McCoy had a perfected security interest in the cattle, thus precluding summary judgment in favor of the bank. McCoy points out that under NMSA 1978, Sections 77–9–21 and 77–9–22, possession of livestock, including cattle, without the necessary documents of title is prima facie evidence that possession is unlawful. Thus, McCoy argues, because there is prima facie evidence that Chandler's possession was unlawful, McCoy met his burden of showing that he retained a security interest in the cattle, which was perfected before Chandler secured a loan from the bank using the same cattle as collateral.

■ McCoy's argument must fail. Even if McCoy established that he held a security interest under Section 55–9–113, the bank would still prevail in this case. A security interest under Section 55–9–113 is one that arises as a matter of law under Article 2. *In re Samuels & Co.*, 526 F.2d at 1247. Under Subsection (c) of Section 55–9–113, the rights of a seller are governed by Article 2 on sales. Comment 2 to Section 55–9–113 refers the reader to Sections 55–2–705, 2–706, and 2–707(2) in particular, which govern the seller's remedies regarding stoppage of delivery and resale after breach. In addition, the court in *Holiday Rambler Corp. v. Morris*, 32 U.C.C.Rep. 1222 (D.Kan.1981), *aff'd sub nom. Holiday Rambler Corp. v. First National Bank & Trust*, 723 F.2d 1449 (10th Cir. 1983), held that a seller's security interest allowed invocation of the right of reclamation under Section 55–2–702. *Id.* at 1226. However, the shipping invoices in this case indicate that the last of the cattle were delivered to the feedlot on March 29, 1986. McCoy alleged in his motion for partial summary judgment that he first made an attempt to have the cattle released to him on April 12, 1986. His attempt to invoke

his reclamation rights thus came after expiration of the ten day period provided by Section 55–2–702. *See Holiday Rambler Corp.*, 32 U.C.C.Rep. at 1226.

 In addition to an Article 2 security interest created as a matter of law under the U.C.C., a seller may create an Article 9 security interest by express agreement. *Id.* McCoy's oral title-retention contract with Chandler may have constituted an attempt to create such a security interest. However, such an interest, if created, falls outside the provisions of Section 55–9–113 and, like other Article 9 security interests, must be evidenced by a written agreement and filed before it could take priority over the perfected security interest of the bank. An oral agreement fails to meet this standard on both counts. The trial court therefore properly concluded that the bank, as a secured party, took priority over McCoy.

Based upon the foregoing, we therefore affirm the district court's entry of summary judgment.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and WALTERS, J., concur.

765 P.2d 1170

Bruce **MERRILL**, Plaintiff–Appellee,

v.

**TABACHIN, INC.**, Defendant–Appellant.

No. 17743.

Supreme Court of New Mexico.

Dec. 21, 1988.

Bruce D. Black Campbell & Black, P.A., Santa Fe, for defendant-appellant.

Warren F. Frost, Rowley & Parker, P.C., Clovis, for plaintiff-appellee.

OPINION

WALTERS, Justice.

On March 30, 1988, the district court refused to set aside a default judgment for $172,129.88 entered against defendant. Two issues are raised on appeal: whether Tabachin, Inc. entered an appearance and was entitled to written notice prior to default; and whether Tabachin otherwise demonstrated grounds for setting aside the judgment. We hold that no appearance was entered and that the court did not

abuse its discretion in denying defendant's motion to vacate the default judgment.

*Facts*

Pedro Zaragosa Fuentes, a Mexican national and president of Tabachin, Inc., allegedly contracted in 1986 on behalf of the corporation to purchase the Merrill Ranch from Bruce Merrill. On January 9, 1987, Mr. Merrill's attorney filed suit against Tabachin for breach of contract, requesting damages or, alternatively, specific performance. Tabachin was served on January 29, 1987.

Richard Olson, a member of a Roswell law firm, agreed by letter to Tabachin on February 5th to represent Tabachin in the suit. Olson then called Mr. Rowley, plaintiff's attorney, and received an extension of time in which to answer. A few weeks later, a second attorney, Dale Ek, of an Albuquerque firm, called Rowley and indicated that he had been retained to initiate negotiations on behalf of Tabachin.

On March 18, 1987, Rowley wrote both Ek and Olson insisting upon action to "get the matter at issue" by March 25, because his client was facing imminent foreclosure if the sale could not be worked out immediately. Mr. Olson informed Tabachin of Rowley's letter and requested clarification from Tabachin of his own status as Tabachin's attorney. After an indirect communication from Tabachin to Olson's secretary requesting that the file be returned to Tabachin, Olson sent the file, together with the summons and complaint, and considered that he no longer represented Tabachin. Olson never did file an entry of appearance or an answer, and made no further attempts to communicate with Rowley, Ek, or Tabachin prior to default.

On March 25, 1987, Rowley sent another letter to Ek and Olson, informing them that the Federal Land Bank would foreclose on Merrill in a few days, and demanding action before then. There were no responses to his letter. On April 2, 1987, Rowley filed a Certificate of Default. Following a hearing on May 7, 1987, the trial court granted a default judgment to Mr. Rowley's client.

In June of 1987 Tabachin attempted to sell land in Dona Ana County and learned that it was prevented from warranting clear title by reason of a transcript of judgment in this cause having been filed by Merrill. On December 19, 1987, Mr. Ek moved to set aside the default judgment.

*Constructive Appearance*

■ Tabachin first argues that Merrill was required to give written notice to Tabachin prior to obtaining a default judgment. Under SCRA 1986, 1–055(B), a party who has entered an appearance in a pending proceeding is entitled to receive written notice three days before any hearing on movant's application for default. Failure to give such notice to one so entitled is grounds to set aside a default judgment. *Rodriguez v. Conant*, 105 N.M. 746, 737 P.2d 527 (1987). Tabachin did not enter a formal appearance, but New Mexico recognizes that constructive appearance may be found when the defaulted party's overt actions show an intent to submit to the jurisdiction of the court. *Mayfield v. Sparton Southwest, Inc.*, 81 N.M. 681, 472 P.2d 646 (1970).

When examining the particular actions of a defaulted party to determine whether his conduct has created a constructive appearance, this court has approved the test of examining the defendant's acts to determine both awareness by the defaulted party of the pending lawsuit and an apparent intention to appear. *Id.*, at 682, 472 P.2d at 647. We found in *Mayfield* that an unsworn letter sent by an agent of the defaulted party to the clerk of the district court, referring to the docket number, with a copy to plaintiff's counsel, and enclosing a check for $9.42, showed the party's intent to appear. Neither Tabachin nor its agents here made any attempt to communicate with or file any pleadings in the court, and it claims the right to notice solely because of the communications with and among the attorneys. Although such acts demonstrate Tabachin's awareness of the suit, they are not affirmative acts of appearance or submission to the court's jurisdiction. *Cf. Gengler v. Phelps*, 89 N.M. 793, 799,

558 P.2d 62, 68 (Ct.App.1976), (Sutin, J., specially concurring), where it was suggested that intention could be inferred from a letter between attorneys.

We decline to hold that inconclusive exchanges among attorneys, with nothing more, is a manifestation of appearance. The facts in this case show confusion running between the defendant and its attorneys, and between them and plaintiff's attorney, which could be interpreted, in the face of plaintiff's attorney's almost frantic requests for definitive action of some sort, as willful delay or negligent conduct by defendant in regard to its duty to answer. It is undisputed that no formal appearance was filed, and no advice of appearance of any kind appears in the record. The letters and telephone calls between lawyers indicate no more than an awareness of the lawsuit. We hold that awareness is not enough. The defaulted party must take some affirmative action to signify *to the court* an intention to submit to its jurisdiction in order to consider that he has made an "appearance." Tabachin itself, by its vacillations and confusing instructions to its two attorneys, contributed to the ineffectiveness of counsels' conduct to establish an "appearance."

*Basis for Setting Judgment Aside*

■ Defendant also argues that the trial court abused its discretion in finding that no meritorious defense existed to justify setting aside the default judgment. We have previously declared that sometimes even a slight abuse of discretion will justify reversal of an order denying a motion to set aside default. *Dean Witter Reynolds, Inc. v. Roven*, 94 N.M. 273, 609 P.2d 720 (1980). We said in *Dean Witter* that if there exists excusable neglect *and* a meritorious defense, "and there are no intervening equities, the default judgment should be set aside and the case decided on its merits." *Id.* at 274, 609 P.2d at 721. But the court here found no excusable neglect, and it also found that plaintiff lost the Merrill ranch and the family ranch by reason of the failure of the contract. It concluded that a vacation of the default would prejudice plaintiff by imposing a substantial financial hardship on him. Consequently, even if we assume that the trial court erred in finding no meritorious defense existed, which we do not decide on the state of this record, we are unable to say that that reason alone (in light of defendant's lack of diligence in answering as well as in moving to vacate, its inexcusable neglect, and the prejudice that plaintiff would suffer), was sufficient to require vacation of the default judgment. The trial court's denial of the motion to vacate and reopen is AFFIRMED.

STOWERS, J., and SOSA, Senior Justice, concur.

765 P.2d 1172

**Grace QUINONES, Petitioner,**

v.

**SANTA FE COUNTY, New Mexico, Employer, and Rockwood Insurance Company, Insurer, Respondents.**

**No. 18028.**

Supreme Court of New Mexico.

Dec. 21, 1988.

Margaret Kegel, Kegel Law Firm, P.C., Espanola, for petitioner.

Roger V. Eaton, Eaton Law Firm, Albuquerque, for respondents.

**OPINION**

WALTERS, Justice.

We issued a writ of certiorari to the court of appeals to review the only question presented by the petitioner, *i.e.*, whether NMSA 1978, Section 52–1–35(B) (Cum. Supp.1983)[1] allows a petitioner in a worker's compensation action to recover expert witness fees for the testimony of expert witnesses who testified but who were not subpoenaed to appear at trial. The district court's award of those fees as costs was reversed by a majority of the court of appeals on grounds that a subpoena or court order to testify is a condition precedent to the recovery of such costs. Judge Fruman dissented on that issue, concluding that Section 52–1–35(B) did not require expert witnesses to be subpoenaed before the trial court could award to the petitioner the costs for their attendance. We think that Judge Fruman's interpretation of the statute is correct and, accordingly, we reverse the court of appeals and affirm the trial court's award.

Section 52–1–35(B), which applies because this action was filed before its repeal in 1986, reads:

No cost shall be charged, taxed or collected by the clerk except fees for witnesses who testify under subpoena. These witnesses shall be allowed the

same fee for attendance and mileage as is fixed by law in other civil actions. Notwithstanding the provisions concerning expert witness fees as provided in Section 38–6–4 NMSA 1978, the court may order the payment of reasonable fees for any expert witness whose examination of the claimant, report or trial attendance is determined by the court to be reasonably necessary in the trial of the case.

This version is an amended form of the 1978 statute, which was interpreted to allow an award for costs of expert witnesses only if the witnesses were subpoenaed. *See Sedillo v. Levi–Strauss Corp.*, 98 N.M. 52, 56, 644 P.2d 1041, 1045 (Ct.App.), *cert. denied*, 98 N.M. 336, 648 P.2d 794 (1982); *Lujan v. Circle K Corp.*, 94 N.M. 719, 723, 616 P.2d 432, 436 (Ct.App.1980); *see also Smith v. City of Albuquerque*, 105 N.M. 125, 128, 729 P.2d 1379, 1382 (Ct.App.1986) (citing Section 52–1–35(B) as allowing an award of costs only when witness is subpoenaed, and denying plaintiff's own travel costs for appearing as a witness in her own case).

In *Bower v. Western Fleet Maintenance*, 104 N.M. 731, 726 P.2d 885 (Ct.App. 1986), the court of appeals noted that the statute had been amended following the decisions in *Sedillo* and *Lujan*, and that the "language of amended Section 52–1–35(B) appears to have liberalized the standard by which a court may award certain costs." *Id.* at 738–39, 726 P.2d at 892–93. The court in *Bower* declared that pursuant to the amended version of Section 52–1–35(B), the standard of review on appeal was whether the trial court had acted arbitrarily or capriciously in granting or denying the award. *Id.*

A plain and fair reading of the amended Section 52–1–35(B) directs us to the conclusion reached by Judge Fruman that the first two sentences of the statute, which set forth the requirement for a subpoena before costs may be awarded, pertain only to nonexpert witnesses. The last clause of

No. 10543.

Court of Appeals of New Mexico

Oct. 6, 1988.

